Bowles Live Stock Commission Company et al., Appellants, v. Chicago Live Stock Exchange et al., Appellees.

## Gen. No. 30,902.

1. Boards of Trade and Exchanges—*right of corporation not a member to seek relief against rules.* A stock commission company joining with its officers having memberships in the live stock exchange in a complaint may ask equity to take jurisdiction of a suit against the exchange to declare void an exchange rule against radio advertising with market reports and expelling members so doing, though the company alone did this and only the individual officers could be members of the exchange.

2. Boards of Trade and Exchanges—*right to refuse reports for radio advertising.* Reports of a live stock exchange market, which are produced by the combined efforts of members of the live stock exchange, can rightly be refused by the exchange to individual concerns for use by radio broadcast to advertise their own business.

3. Boards of Trade and Exchanges—*reasonableness of rule prohibiting radio broadcasting of reports.* Rule of a live stock exchange forbidding use of market reports by radio to advertise individual firms, but not advertising by radio nor broadcasting market reports by radio, is not an unreasonable restriction of competition.

4. BOARDS OF TRADE AND EXCHANGES—*adoption of restrictive rules after contract with third person.* Live stock commission company may not complain that a live stock exchange rule against radio advertising by use of market reports was adopted after their contract with the radio concern, when the contract violated in spirit, at least, a preexisting rule, by the company's paying for a wire from its office to that of the radio concern to carry such advertising to the radio broadcaster.

5. ESTOPPEL—*inconsistent position in judicial proceeding.* Live stock commission company may not claim a live stock exchange is interfering with a contract between itself as an outside party and a radio broadcaster by forbidding radio broadcasting where, though corporations were not admitted to the exchange, its individual officers were members, and the company justified its right to seek relief by claiming a quasi membership.

Appeal by plaintiffs from the Circuit Court of Cook county; the HON. FRANCIS S. WILSON, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1926. Affirmed. Opinion filed December 29, 1926.

BLUM, BLUM & DELANEY, for appellants; HENRY S. BLUM and ELMER M. LEESMAN, of counsel.

SIMS, WELCH, GODMAN & STRANSKY, for appellees; F. J. STRANSKY, of counsel.

MR. JUSTICE THOMSON delivered the opinion of the court.

This is an appeal by complainants from a decree dismissing their bill for want of equity.

The defendant Stock Exchange is a corporation, organized "to promote and maintain uniformity in the customs and usages of merchants," engaged in buying and selling live stock in the Union Stock Yards at Chicago. The other parties defendant are the officers and directors of the Exchange. It had been in existence many years at the time the controversy involved in this case arose. It has over 500 members. The complainant Commission Company is engaged in the live stock commission business in the Stock Yards. John P. Bowles, president and general manager of

that Company, has been a member of the Exchange throughout its existence. The other parties complainant are various officers and employees of the Commission Company, who have memberships in the Exchange. The Commission Company as a corporate entity is not a member of the Exchange, but the various individual parties complainant, officers and employees of the Commission Company, hold memberships in the Exchange, which were paid for by the Company and which have been indorsed in blank by the individual officers and employees to whom they were issued, and by them delivered to the Commission Company which is alleged in an amendment filed to the bill to be the owner of them. There are ten such memberships, alleged to be worth over $20,000 in the aggregate. Complainants alleged that it would be impossible for a concern to engage in the live stock commission business in the Stock Yards without holding such memberships in the Exchange through its officers and employees.

Among the by-laws and rules of the Exchange, which have been in effect for some time, is one known as Rule XXIV, to the effect that no member engaged in selling live stock, for nonresidents on commission, "shall pay, agree to pay, or cause to be paid, the cost of transmission of any telephone or telegraph message, either sent or received," except when such message pertains "to inquiries instituted by and for the personal information of members or for the purpose of instructing superintendents or nearby feeding yards to load and ship all or parts of consignments of stock that are held on feed at such feed yards while in transit and which are consigned to commission firms at these yards."

On February 3, 1925, the Commission Company entered into a contract with the Radiophone Broadcasting Corporation, "for the purpose of advertising its business by broadcasting market reports," as alleged

in the bill of complaint. By the terms of this contract, the Broadcasting Corporation agreed to render its broadcasting service from its broadcasting station in Chicago, for the broadcasting of market reports direct from the Commission Company's office in the Stock Yards "by special wire," for a period of 260 weeks. The reports were to be broadcast daily for ten minutes—from 12:50 to 1:00 p. m.,—and were to be read by members of the Commission Company. It was also provided that "cost of installation and rental of private wire," from the office of the Commission Company to the station of the Broadcasting Corporation was to be borne by the Commission Company. The Broadcasting Corporation agreed to furnish the Commission Company "with either the original or a copy of all letters or telegrams received" pertaining to the program of publicity of the Commission Company.

Complainants alleged in their bill that upon the execution of this contract the Commission Company "caused the necessary equipment to be installed at its own expense," and proceeded to broadcast market reports from its offices each day for the purpose of advertising its business.

On October 30, 1925, the Live Stock Exchange adopted an amendment to its Rule XXIV, providing that "No member of this Exchange shall use    *    *    * radio broadcasting stations, or any facilities in connection therewith, to disseminate, distribute or make known live stock market information for advertising purposes or the solicitation of business for himself or any particular live stock commission merchant or concern engaged in the live stock commission business. All inquiries coming to members from radio broadcasting stations or from any person for the use of radio broadcasting stations for live stock market information shall be referred to the Secretary of the Exchange.

"The Board of Directors of this Exchange is hereby authorized in its discretion to make such arrangements as it may deem advisable for the broadcasting by radio by the Exchange and on its behalf of market information or other matters of interest to the live stock trade."

Shortly after the adoption of this amendment to Rule XXIV, the Exchange sent a written communication to the Commission Company, advising it formally of the adoption of the amendment and that, pursuant thereto, it would be necessary that the broadcasting of market information, which the Company had been engaged in for advertising purposes, would have to cease. In this communication, the Exchange offered to be substituted for the Commission Company in its contract with the Broadcasting Corporation, to the end that the Commission Company might be relieved of such financial obligations as it might be under as a result of their contract with the Broadcasting Corporation.

The Commission Company sent a written communication in reply to the Exchange, in which the Company took the position that the amendment to Rule XXIV was "not enforceable against the contract entered into by us." In this communication the Commission Company further advised the Exchange that the Broadcasting Corporation was unwilling to permit the substitution of the Exchange for the Commission Company in the contract it had with the latter.

The Exchange took the position that a continuance of the broadcasting of market information by the Commission Company, for advertising purposes, was a violation of the provisions of Rule XXIV, as amended, and proposed to take such action as its by-laws and rules provided for, against the officers and employees of the Commission Company, in whose names the memberships controlled by that Company were held. Thereupon the Commission Company advised the

Broadcasting Corporation that it would not be able to continue its business if those of its officers and employees who held memberships in the Exchange were suspended or expelled and for that reason, and because of the power of the Exchange to suspend or expell the members, if the Exchange continued to take the position that the broadcasting which the Commission Company was doing was a violation of its amended Rule XXIV, it might be obliged to cease such broadcasting. Thereupon the Broadcasting Corporation filed a bill in the circuit court of Cook county against the Bowles Live Stock Commission Company and the Exchange and its officers and directors (which is case 243 Ill. App. *post,* in this court, to which reference is hereinafter made), and in that proceeding obtained a temporary restraining order enjoining the Commission Company from discontinuing its broadcasting under its contract with the Broadcasting Corporation.

In the bill of complaint which was then filed by the Commission Company, in the suit at bar, in which those of its officers and employees who held the memberships in the Exchange which it controlled joined, they alleged that the amendment to Rule XXIV, which had been adopted by the Exchange, was unreasonable and void; that the service rendered by the Commission Company in broadcasting market information, "although intended primarily as a means of advertising" the business of the Commission Company, nevertheless rendered to those interested an important public service; and that the amendment to Rule XXIV, by which it was sought to bring about an end of this service, was "contrary to public policy and inimical to the best interests of the public"; and that, in attempting to enforce the rule as so amended, the Exchange was seeking to impair the obligation of the contract existing between the Commission Company and the Broadcasting Corporation.

The complainants prayed that the Exchange and its officers and directors be enjoined from enforcing Rule XXIV as amended, by disciplinary action against those holding the memberships in the Exchange, upon which the Commission Company relies for the doing of its business, and that the amendment to the rule be declared unlawful and void.

By their answer the defendants alleged that the Exchange was a voluntary association of persons, organized, among other things, to secure to its members the benefits of co-operation in the furtherance of their business and to promote uniformity in their customs and usages, to accomplish which it was necessary to adopt certain rules and by-laws for the government of its members, which would prevent any of them from employing customs or practices from which they might procure an undue advantage over other members; that the complainants had not only been broadcasting market reports under their contract, but that they had been doing so for the purpose of advertising and "boosting" the business of the Commission Company, to the great injury of the other members of the Exchange; that it was impossible in the present state of radio industry for all members of the Exchange to broadcast in the manner employed by the Commission Company, and that the use of radio by the complainant Company as an advertising and boosting agency for itself amounted to an unfair and unjust trade practice detrimental to the members of the Exchange; that in its use of the radio, the Commission Company had broadcast its material in a deceptive manner, so as to lead those who received such material to believe that the Commission Company had made unusual and extraordinary sales of stock consigned to it and that it occupied a position of great authority and influence in the Union Stock Yards, such as was not possessed by other live stock traders; that the complainant Commission Company was not using the radio for the pur-

pose of serving the public or giving information to the public, concerning market reports, but rather for the purpose of advertising its own business, to the great detriment of the other traders in the Yards; that the amendment to Rule XXIV, complained of in the bill of complaint, was not intended to prohibit the broadcasting of market reports, but rather to prevent the dissemination of live stock market information for advertising purposes or for the solicitation of business for any individual member of the Exchange or any particular commission company engaged in the live stock commission business, and also to prevent any member from using the radio for the broadcasting of advertising and "boosting" propaganda, in such a manner as to mislead those who received it, which would thus work to the disadvantage of the other members of the Exchange.

The defendants further alleged in their answer that if the Commission Company ceased its broadcasting, neither the general public nor the raisers and shippers of stock would be deprived of securing market information speedily, for the reason that such information was being broadcast daily from a radio station located in the Union Stock Yards, this broadcasting being under the control of the Chicago Daily Drovers Journal; that complete live stock information was broadcast from this station in the yards each day, which quotations were prepared by the United States Bureau of Economics; that this broadcasting was done fairly and impartially and in a manner which would not enable any member of the Exchange, or any firm engaged in the stock commission business in the Union Stock Yards, to have an unfair advantage over any other.

A temporary injunction having been issued in case 243 Ill. App. *post,* above referred to, restraining the Commission Company from ceasing to broadcast market information in fulfillment of its contract with the

Broadcasting Corporation, and further restraining the Exchange from enforcing its amendment to Rule XXIV, in so far as that rule was claimed to apply to the contract between the Commission Company and the Broadcasting Corporation, and the Exchange having made a motion in that case to dissolve that temporary injunction, and an application having been made by the Commission Company in the suit at bar for a temporary injunction, likewise restraining the Exchange from enforcing its amendment to Rule XXIV, these two motions were heard together in the trial court, and it was stipulated by all the parties that at such hearing all the allegations of fact set forth by the Exchange and its officers and directors, in the answers filed by them in each of the two cases, might be considered with the same force and effect as if such allegations were presented at such hearing supported by affidavits. At the consolidated hearing of the two motions, certain affidavits were also presented, one by John P. Bowles which was to the effect that, prior to the execution of the contract between the parties, he had advised the president of the Exchange to the effect that the Commission Company expected to execute such a contract; that he had examined the rules of the Exchange and found nothing there against such action, and that after such contract had been executed and the Exchange held a meeting to consider the' adoption of the amendment to Rule XXIV, the president of the Exchange admitted that he had received such advice from Bowles and had communicated it to the directors of the Exchange. Bowles further stated in this affidavit that he had never heard anything in this matter from the president of the Exchange.

There was also admitted a counteraffidavit by Everett W. Brown, president of the Exchange, to the effect that in the conversation he had with Bowles, wherein the latter told him he was negotiating with the Broadcasting Corporation, with the view of broad-

casting the market reports, he told Bowles that in his opinion such a contract might conflict with the rule of the Exchange, covering telephoning and telegraphing, which was Rule XXIV as it then existed and prior to the amendment, and he further suggested to Bowles that he thought the latter ought to make some indication of his intentions to the Board of Directors of the Exchange; and in reply Bowles told him that he had submitted the matter to his attorneys and they had advised him that his proposed contract with the Broadcasting Corporation would not interfere with the existing rule; that no formal communication was ever received by the Exchange from the Commission Company, and the next Brown heard of the matter was when Bowles told him the contract had been entered into by his Company.

Upon the consolidated hearing of the two motions and the consideration by the chancellor of the respective bills of complaint and answers thereto, and the affidavits submitted, decrees were entered dismissing the bills of complaint in both cases; the temporary injunction which had been issued in case 243 Ill. App. *post,* was continued in force pending the perfection of the appeals which were prayed from both decrees. After the appeals from these decrees were perfected to this court a motion was made here that the temporary injunction issued in the trial court be continued in force, pending the decision of the appeals, and that motion was allowed.

In support of the decree appealed from in the suit at bar, counsel for the Exchange urge that the entity of the Commission Company and its property and contract rights are distinct and separate from the rights of its individual officers and employees who are members of the Exchange; that the Commission Company itself is not a member of the Exchange and possesses no member rights, and therefore may not complain of the enforcement of the rules and by-laws of the Ex-

change as to its members; that the officers and employees of the Commission Company who are members of the Exchange, and who are complainants herein, are not parties to the contract between the Commission Company and the Broadcasting Corporation and therefore they have no right to seek the aid of a court of equity in protecting that contract. The Exchange is a voluntary association of individuals and a corporation not for pecuniary profit. But the record also discloses that anyone desiring to engage in the live stock commission business, in the Union Stock Yards, must become a member of the Exchange in order to acquire the standing in that business which is necessary to the acquisition of business and trade, and it discloses further that although the Exchange is a corporation not for pecuniary profit, as such, it was organized and is maintained for direct objects which have the ultimate object of making the business conducted by the members of the Exchange successful and profitable. It is true that the individual complainants, officers and directors or employees of the Commission Company are not parties to the contract between that Company and the Broadcasting Corporation. But both the Commission Company, which is party to the contract sought to be protected, and the individual officers, directors and employees of that Company, who are members of the Exchange, are parties complainant, and we are of the opinion that the relation of the parties is such that equity may properly take jurisdiction of the subject matter and determine whether the situation complained of calls for the relief prayed for.

A number of questions are discussed in the briefs filed by the respective parties in this court. In our opinion the important question here presented is the question of whether Rule XXIV of the Exchange, as amended, is legal and valid. If it is, the chancellor did not err in entering the decree appealed from. We

believe the question referred to must be answered in the affirmative.

Both the original rule and the amendment thereto were clearly within the charter powers of the Exchange, the purpose of which was there stated to be that of promoting uniformity in the customs and usages of merchants and to secure to its members the benefits of co-operation in the furtherance of their legitimate pursuits. The so-called telephone and telegraph rule, which was Rule XXIV before the radio amendment, is substantially the same rule which was attacked by the Federal Government in *Hopkins v. United States,* 171 U. S. 578, which was an action to dissolve the Kansas City Live Stock Exchange, an organization patterned after the Exchange involved here. It was there contended that this telephone and telegraph rule was an attempt to regulate interstate commerce and operated in restraint of trade. The question really decided in that case was that the Exchange was not engaged in interstate commerce and therefore the contention made was untenable. But the court also held that the rule referred to was "so clearly not an attempt to regulate or restrain the general sending of telegrams that it would seem unnecessary to argue the question."

The object of the original telephone and telegraph rule clearly was to prevent members of the Exchange from contesting with one another for the business of shippers of live stock by means of prepaid telephone or telegraph messages. When the radio came into general use, a new field was opened up. But, under the pleadings considered pursuant to the stipulation of the parties, that field was available to only a few, for the same purpose, in a given locality. There are over 500 members of the Exchange, so, in order to "promote uniformity in the customs and usages of merchants and to secure to its members the benefits

Bowles Live Stock Co. v. Chicago Live Stock Exch., 243 Ill. App. 71.

of co-operation in the furtherance of their legitimate pursuits'' the Exchange adopted its amendment to Rule XXIV.

It will be seen that this amendment does not say that members of the Exchange shall not use radio broadcasting stations to disseminate live stock information, but it provides that no member shall do so, ''for advertising purposes or the solicitation of business,'' either for himself or for any particular concern. In our opinion the amendment is reasonable and valid. The live stock market, as made each day in the Union Stock Yards, is based on the combined effect of the trades entered into in the course of the business day by those engaged in the live stock commission business at the Yards—all of them being members of the Exchange. The subject of the amendment to Rule XXIV —''live stock market information''— is thus the product of the daily transactions of the members of the Exchange with each other. This live stock market information, being affected with a public interest, would have to be so used as to be in conformity with that interest and could not be so used as to discriminate in favor of some and against others, nor could it be so used as to create a monopoly, but that the members of the Exchange had the power under their charter, and the right under the law, to enact a rule or by-law to the effect that no one of them should use this latest and most rapid means of communication— the radio—for the purpose of disseminating that joint product of the business of *all* of them ''for advertising purposes or the solicitation of business'' for *one* of them or for his firm or any particular merchant or concern, seems to us to be clear. It is no answer to this to say, as counsel for the Commission Company does, that because the dissemination of live stock market information is of interest and value to the public, a rule should be considered against the public interest if it prevents or interferes with such a service

on the part of one who is rendering it, simply because he may thereby be acquiring some personal benefit. The record shows, and indeed the Commission Company frankly admits, that its primary purpose in broadcasting information as to the live stock market at the Stock Yards in Chicago, from day to day, is to advertise itself and induce the shippers of cattle to consign them to it rather than to others engaged in the commission business at the Yards. To make such use of what we have pointed out is really the joint product of the trades and business of all those who are there engaged in that business, may, in our opinion, properly be considered an unfair practice and so properly prohibited by rule of the Exchange. And further, the record also shows that if the rule is complied with and the broadcasting done by the Commission Company for advertising purposes ceases, the shippers of cattle and the public generally will not be deprived of this daily live stock information, for it is, and no doubt will continue to be, broadcast daily by a station located in the Stock Yards under the control of the Chicago Daily Drovers Journal—the market information thus disseminated being based on quotations assembled and prepared by an agency of the Federal Government, and therefore being official in character.

While some of the language used by the court in the course of its opinion in *People ex rel. McIlhany v. Chicago Live Stock Exch.*, 170 Ill. 556, is broad enough to support the contentions of the Commission Company in the case at bar, in our opinion both the issues involved and the facts presented in that case were entirely different from those we have to consider here — so much so as to make that decision of our Supreme Court inapplicable in this case. It was held that the by-law of the Exchange, which was there attacked, was an effort to ''prevent competition and to restrict individual efforts and freedom of action in trade and

commerce,'' and the court held that to be a restriction ''hostile to the public welfare, not consonant with the spirit of our institutions and in violation of law,'' and therefore void. In our opinion that may not be said of the amendment to Rule XXIV. The enforcement of that rule will not tend to prevent competition nor will it unreasonably restrict individual efforts and freedom of action on the part of the Commission Company.

The enforcement of the rule will have no effect on the readiness and dispatch with which stock raisers and dealers, or the public, may receive their live stock market information. It will not affect the right of the Commission Company or of any member of the Exchange to advertise their business, even by radio. It will prevent merely the radio use of live stock market information, the product of the combined business of all members of the Exchange, by any one of them, for the purpose of advertising the individual business of himself or his concern. That we consider a reasonable regulation, having no such effect as was condemned by our Supreme Court in *People ex rel. McIlhany v. Chicago Live Stock Exchange, supra.*

Likewise, in our opinion, the case of *Inter-Ocean Pub. Co. v. Associated Press,* 184 Ill. 438, upon which the Commission Company relies, may clearly be distinguished from the case at bar. There the Publishing Company, as a stockholder member of the Associated Press, sought to enjoin the enforcement of a clause in the by-laws of the latter, by which the Publishing Company was required not to take or publish news from any news-gathering source other than the Associated Press. The court held that the use of the property of the Associated Press in gathering and selling news was one in which the public had an interest and, therefore, ''upon principles of justice it can make no distinction with respect to persons who wish to purchase information and news. for purposes

86 APPELLATE COURTS OF ILLINOIS.

Bowles Live Stock Co. v. Chicago Live Stock Exch., 243 Ill. App. 71.

of publication, which it was created to furnish," and that the clause in the by-laws which sought to restrict the Publishing Company from obtaining news from other sources than from the Associated Press, "is an attempt at restriction upon the trade and business among the citizens of a common country. Competition can never be held hostile to public interests, and efforts to prevent competition by contract or otherwise can never be looked upon with favor by the courts." The court also held that the enforcement by the Associated Press of the clause there complained of, would tend to create a monopoly in its favor and that thereby it "could dictate the character of news it would furnish and could prejudice the interests of the public. Such a power was never contemplated in its creation and is hostile to public interests. That by-law tends to restrict competition, because it prevents its members from purchasing news from any source other than from itself * * * Its tendency, therefore, is to create a monopoly in its own favor and to prevent its members from procuring news from others engaged in the same character of work, and such provision is illegal and void." For the reasons already referred to, we hold that the amendment to Rule XXIV, adopted by the Exchange in the case at bar, is not open to such objections.

Another case relied upon by the Commission Company is *New York & Chicago Grain & Stock Exch. v. Board of Trade of the City of Chicago,* 127 Ill. 153. That case is likewise not applicable here, in our opinion. There the court held that market quotations, though private property, were so used by the Board of Trade as to the become affected with a public interest and they were therefore subject to such public regulation as was necessary to prevent injury to such public interest, and that the doctrine "would forbid that a monopoly should be made of them by furnishing them to some and refusing them to others who are

equally willing to pay for them and be governed by all reasonable rules and regulations, and would prevent the Board of Trade or the telegraph companies from unjustly discriminating in respect to the parties who will be allowed to receive them.'' No such situation as the court thus refers to is presented in the case at bar.

The Commission Company contends that the amendment to Rule XXIV must be considered invalid as against those members of the Exchange who had entered into contracts prior to the adoption of the amendment, relying upon the by-laws as they existed before the amendment, even though such contracts may conflict with the provisions contained in the amendment. That contention is without merit, if for no other reason, because we are of the opinion the contract entered into between the Commission Company and the Broadcasting Corporation contains provisions which violate Rule XXIV as it existed before the so-called radio amendment. We refer to those provisions of the contract calling for the installation of a special wire from the offices of the Commission Company to the Broadcasting Station, the cost of which installation, as well as the rental of such private wire, was to be borne by the Commission Company, and the further provision whereby the Broadcasting Corporation agreed to furnish the Commission Company with either the originals of all letters or telegrams received pertaining to the Commission Company's program of publicity or copies thereof. In this connection it should further be noted that while the contract between these parties provided that the matter broadcast was to be confined to such as was intended for ''general unrestricted reception, and not as a communication to specific individuals, firms or corporations,'' the record shows the Commission Company had made use of the broadcasting services of the Broadcasting Corporation ''for the purpose of convey-

ing messages to certain individuals designated by name in said radio messages, so as to give said individuals, so communicated with, special and unfair advantages over other individuals similarly situated," all of which was clearly contrary to the spirit, if not the letter, of Rule XXIV, before the radio came into commercial use and before the amendment to that rule was adopted, so as to extend the rule to cover the new situation presented when that new invention came into such use.

Nor are we able to agree with the contention advanced by the Commission Company, to the effect that "this is * * * the simple case of interference by a third person with a contract relationship," in support of which a number of cases have been cited and among them certain cases in which a property owner had entered into labor contracts calling for workmen who were not affiliated with certain organizations, in which cases such owner successfully enjoined those who were endeavoring to interfere with the performance of their contract obligations by such workmen. That is not at all the situation we have here nor is it analagous to it. If the Commission Company, though itself not a member of the Exchange, being joined as party complainant with its officers and employees who are members, is to be heard to claim or seek the benefit of membership rights, contending as it does that, though not actually a member, it has long been treated as such by the Exchange, then it must not seek to avoid all the consequences attaching to such a status, by contending, for the purpose of the point now being referred to, that it is an outside party, whose contract rights are being interfered with by the Exchange with which it has no connection. That must be taken to be its contention if the authorities it relies upon in support of it are to be considered applicable. The contention, in our opinion, is not tenable.

For the reason we have referred to, the decree of the circuit court is affirmed.

*Decree affirmed.*

O'CONNOR, J., concurs.

MR. PRESIDING JUSTICE TAYLOR, specially concurring: I am of the opinion that the Bowles Live Stock Commission Company, a corporation for profit, being one of the complainants, and not being a member of the Chicago Live Stock Exchange, a corporation not for pecuniary profit, has no right, in equity, to question the validity or legality of a by-law of the Chicago Live Stock Exchange, and, therefore, the complainants, on the face of the bill, are not entitled either to an interlocutory, or perpetual injunction. *American Live Stock Commission Co. v. Chicago Live Stock Exch.,* 143 Ill. 210.

For that reason, and, also, for the reasons set forth in the majority opinion, I am of the opinion that the decree of the chancellor should be affirmed.